**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4917-17T4

LAUREN D. BURGER IRREVOCABLE
TRUST, HOWARD J. BURGER, Trustee,
and SUZANNE J. BURGER IRREVOCABLE
TRUST, HOWARD J. BURGER, Trustee,
and HOWARD J. BURGER, Individually,

     Plaintiffs-Respondents,

v.

AL AMJADY,

     Defendant-Appellant.

_____

          Submitted April 30, 2019 – Decided May 24, 2019

          Before Judges Hoffman and Enright.

          On appeal from Superior Court of New Jersey, Chancery Division, Union County, Docket No. F-001533-17.

          Mackevich Burke & Stanicki, attorneys for appellant (James E. Mackevich, on the briefs).

          Burger & Petino, LLC, attorneys for respondents (Howard J. Burger, of counsel and on the brief; Randi S. Greenberg, on the brief).

PER CURIAM

This case concerns an attorney's attempt to enforce a mortgage loan made to a longtime friend and client. For the reasons that follow, we affirm the trial court's bench decision granting a final judgment of foreclosure.

I.

We derive the facts from the trial court's decision. Defendant Al Amjady owned and operated a liquor store in the 1980s. Plaintiff Howard J. Burger represented defendant in the purchase and subsequent sale of his liquor store. Since that time, plaintiff has represented defendant and his family in numerous cases. Over the course of their relationship, the parties became close friends.

In 1992, defendant lost his home to foreclosure and declared personal bankruptcy. Since then, defendant has worked in the used car business, beginning as a salesman before starting his own used car company with his brother. When defendant's brother left the company, defendant formed All Cars Corporation, which plaintiff incorporated.

As part of the business, defendant obtained financing for his customers, helped complete automobile loan applications, financed down payments, and financed the purchase of used vehicles. Based on this background, the trial judge determined defendant had complete familiarity "with the terms of finance,

A-4917-17T4

including promissory notes which he assisted customers in signing and . . . which he signed when purchasing at auctions." Defendant's business also required a banking license in order to operate.

In 1997, defendant decided to purchase the lot where he operated his used car business. Plaintiff represented defendant in this transaction, but did not require defendant to pay legal fees. In fact, defendant did not pay plaintiff legal fees for any matter after 1990. Plaintiff counseled defendant to make the purchase, noting he could rent out portions of the property to pay off the financing costs.

However, defendant could not obtain financing due to his credit history, which included a bankruptcy and a foreclosure, and because there had not been an environmental study conducted on the property. He therefore sought plaintiff's help. Plaintiff agreed to lend him $150,000.

On May 9, 1997, plaintiff sent defendant a letter describing the change in their relationship from that of attorney-client to lender-borrower and outlining the terms of the loan. The letter also advised defendant to seek independent counsel. The trial court later determined the letter, while it complied with Rules of Profession Conduct (RPC) 1.8(a)(1) and (2), failed to comply with (3) since plaintiff did not confirm defendant's informed consent to the transaction by

3

having him sign the letter. The purchase and the loan were completed on September 16, 1997. Plaintiff also made several other mortgage loans to defendant related to purchasing the lot and running the business.

Central to this dispute is a loan for $45,000 from plaintiff and two trusts controlled by him. Although the note was a twelve percent, interest only note, payable on demand, the parties appear to agree that only eight percent interest was actually charged and paid. Plaintiff drafted the loan documents using "plain language forms by All State Office Supply." Plaintiff did not advise defendant of the conflict in writing as he had previously done, but did urge defendant to retain independent counsel.

On April 20, 2015, plaintiff and defendant again signed additional forms outlining each of the loans with defendant acknowledging the debt. Defendant does not deny signing the acknowledgment, but claims he signed everything plaintiff requested him to sign.

In September 2014, plaintiff told defendant he planned to retire and demanded payment of the principal of the loan. Defendant told plaintiff he did not have the money, but offered to pay $6000 per month beginning September 2016. Plaintiff agreed to wait. However, sometime between October and December 2016, defendant advised plaintiff he would not make the payments.

A-4917-17T4

Plaintiff attempted to resolve the dispute with defendant, but defendant refused to make any payments at all. In January 2017, plaintiff filed this foreclosure proceeding.

The matter proceeded to trial, where an expert for each side testified. The experts relied on the same underlying facts, but reached differing conclusions about the fairness of the loans. The main facts relied upon were:

> [1)] defendant was a poor risk; 2) there was no loan application; 3) the property did not have an environmental study; 4) the loan was an on demand loan; 5) the interest rate was 12 percent[1] . . . 6) the defendant's income tax return showing $39,000 showed that the defendant did not have sufficient income to pay the loan. The defendant's business gross income was between $1.2 million and $1.8 million and his markup was 10 percent, that's between $120,000 and $180,000.

Each expert viewed the transaction as unfair to the interests of the party who retained him. Ultimately, the trial court rejected defendant's arguments and found the transaction weighed heavily in defendant's favor. As a result, the court entered the foreclosure judgment under review. This appeal followed.

---

[1] Both parties conceded that the interest paid was only eight percent, rather than twelve.

A-4917-17T4

II.

The parties do not dispute an attorney-client relationship existed at the time of the loan. Courts hold attorneys to a high standard of fairness, good faith, and fidelity. See Estate of Spencer v. Gavin, 400 N.J. Super. 220, 242 (App. Div. 2008). Because of this high duty, "an attorney's freedom to contract with a client is subject to the constraints of ethical considerations and the Supreme Court's supervision." Cohen v. Radio-Elecs. Officers Union, 146 N.J. 140, 155 (1996).

Our RPC expressly forbid an attorney from entering a "business transaction with a client or knowingly acquir[ing] an ownership, possessory, security or other pecuniary interest adverse to a client unless" the attorney meets the following three requirements:

> (1) the transaction and terms in which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner that can be understood by the client;
>
> (2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel of the client's choice concerning the transaction; and
>
> (3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction,

A-4917-17T4

including whether the lawyer is representing the client in the transaction.

[RPC 1.8(a).]

In Milo Fields Trust v. Britz, 378 N.J. Super. 137, 148-49 (App. Div. 2005), we explained "business transaction[s] between an attorney and client [are] not prohibited" by RPC 1.8(a), but rather are deemed "presumptively invalid . . . ." An attorney may overcome the presumption of invalidity by showing: "[(1)] full and complete disclosure of all facts known to the attorney, [(2)] absolute independence of action on the part of the client, [(3)] the fairness and equity of the transaction, [(4)] the lack of overreaching, and [(5)] the client's understanding of the importance of independent representation." Ibid. (citing P & M Enters. v. Murray, 293 N.J. Super. 310, 314 (App. Div. 1996)). The party seeking to affirm the transaction must prove each element by "the clearest and most convincing evidence . . . ." P & M Enters., 293 N.J. Super. at 314. The failure to rebut the presumption usually results in the invalidation of the transaction. Van Horn v. Van Horn, 415 N.J. Super. 398, 415 (App. Div. 2010) (citing Milo Fields Tr., 378 N.J. Super. at 154).

We do not disturb the factual findings and legal conclusions of the trial judge unless "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests

7

of justice . . . ." Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 478 (1974). We therefore examine whether "there is substantial evidence in support of the trial judge's findings and conclusions." Ibid.

Here, the trial judge made specific findings of fact regarding the propriety of the transaction:

> 1) that the defendant was a sophisticated businessman as a borrower; 2) that the client asked the lawyer for the loan because he couldn't get the money elsewhere; 3) that the loan was made out of friendship; 4) that the client signed the loan documents; 5) that the client paid interest only and knew it was interest only . . . from the existence of the loan . . . without complaint; 6) [that] the loan was fair and reasonable to the client. He could not get the same loan elsewhere, but plaintiff could've invested elsewhere for better results; 7) [that] the credibility of the client, Mr. Amjady, was stretched beyond the limits of credulity.

The trial court's factual findings support its legal conclusion finding the agreement legally enforceable. Plaintiff fully disclosed the facts underlying the transaction and avoided interdependence of action. In his May 1997 letter, plaintiff advised defendant that the loan "would alter our relationship of attorney and client to that of borrower and lender." The same letter also spelled out the terms of the arrangement, and "urge[d defendant] to seek independent legal counsel and financial advice before going ahead with this transaction." The parties memorialized the transaction using "plain language" forms. Defendant

had dealt with financial transactions, loans, lending agreements, and had even obtained a banking license for his business.

There was also independence of action because defendant sought out plaintiff's help. This case did not involve an instance in which an attorney sought to take advantage of a vulnerable client. Defendant could not obtain other financial support for his business due to his poor credit, bankruptcy, and previous foreclosure. Because of this, defendant turned to his attorney, who was also his friend and "angel," to get the money he needed. Defendant's business sophistication also factors into the analysis, since sophisticated parties are less susceptible to being taken advantage of. See Milo Fields Tr., 378 N.J. Super. at 149.

The trial judge concluded the loan agreement was fair and equitable. Defendant had no other viable options for obtaining funds. As the trial court determined, based on plaintiff's expert, the loans contained favorable interest rates to defendant. A commercial lender would have required around eighteen percent interest, whereas plaintiff lent at a maximum of twelve percent. Plaintiff also could have earned greater returns on his money by investing conservatively with the Standard and Poor's Index. Based on these facts, the trial court correctly

determined "all of these claims lead to the conclusion that it was the defendant who took advantage of the plaintiff . . . ."

RPC 1.8(a)(3) requires an attorney entering into a business transaction with a client to obtain the client's "informed consent, in a writing signed by the client . . . ." As noted, plaintiff did not obtain this writing at the outset of the business transaction.

Nevertheless, "[if] the attorney can demonstrate that the intent and purpose of the rule was met, the transaction should not be disturbed." Milo Fields Tr., 378 N.J. Super. at 149 (citing P & M Enters., 293 N.J. Super. at 314). We have defined that intent as: to avoid "the hoodwinking of helpless clients out of funds in a business venture that is essentially for the benefit of the lawyer . . . ." Id. at 147-48 (quoting In re Wolk, 82 N.J. 326, 335 (1980)). Here, plaintiff did not "hoodwink" a "helpless" client in a venture "essentially for the benefit of the lawyer."

Further, the trial court's findings explain the fairness of the deal to defendant. Defendant received a loan he could not otherwise obtain. Even if he had obtained another loan, the record demonstrates the interest rate would have greatly exceeded the rate plaintiff charged defendant. As the trial court explained, if anyone received an unfair deal, it was plaintiff. Lastly, although

10

plaintiff did not obtain a written informed consent, his failure to achieve exact compliance with the RPC does not preclude him from enforcing the loan because the record otherwise contains clear and convincing evidence that the intent and purpose of the rule was satisfied.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION